# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| ESTATE OF RYAN J. MITCHELL,<br><br>    Plaintiff,<br><br>v.<br><br>CITY OF WAUPUN, MICHAEL NAVIS, and TREVOR KREITZMAN,<br><br>    Defendants. | Case No. 21-CV-322-JPS<br><br>**ORDER** |

**1. INTRODUCTION**

On March 11, 2021, Plaintiff Estate of Ryan J. Mitchell ("Plaintiff") filed the present 42 U.S.C. § 1983 action against Defendants City of Waupun ("Waupun"), Officer Michael Navis ("Officer Navis"), and Officer Trevor Kreitzman ("Officer Kreitzman") (collectively, "Defendants"), alleging violations of Ryan J. Mitchell's ("Mitchell") Fourth, Eighth, and Fourteenth Amendment rights. ECF No. 1.

On May 24, 2022, Defendants filed a motion for judgment on the pleadings or, in the alternative, a motion for summary judgment. ECF No. 11. On August 25, 2022, the Court denied the motion. ECF No. 21. The Court held that the motion was not properly one for judgment on the pleadings. *Id*. at 4–7, 10 ("The motion submitted by Defendants is not properly one for judgment on the pleadings, both because of its reliance on information outside of the pleadings and because it was not made 'early enough not to delay trial,' . . . ."). The Court also noted that the parties failed to comply with the Court's summary judgment protocols because they failed to agree upon and file a stipulated set of facts. *Id*. at 9. The Court concluded that, in

light of the parties' failure to agree upon facts integral to summary judgment, it could not grant Defendants' motion because such failure evidenced that material facts were disputed and that those disputes are genuine. *Id*. at 13 (noting that the parties disputed the extent of the officers' knowledge about Mitchell's condition and the circumstances of his release from Memorial Hospital, whether that release was conditioned on Waupun Police Department transporting him, and whether Mitchell was under the officers' custody).

On August 26, 2022, Defendants filed a notice of appeal of the Court's August 25, 2022 order. ECF No. 22. On October 24, 2022, the Seventh Circuit dismissed the appeal for lack of jurisdiction, writing that it trusted that the Court would address the qualified immunity issue before trial. ECF No. 31.

On December 14, 2022, the Court entered a revised trial scheduling order, setting trial for April 3, 2023. ECF No. 32. On December 22, 2022, the parties filed a joint motion to adjourn the trial date in light of an unspecified conflict. ECF No. 33. The Court denied the motion in a text only order on December 23, 2022.

On January 12, 2023, Defendants filed a motion to vacate the trial date and stay proceedings. ECF No. 34. Defendants requested that the Court vacate the deadlines associated with the case and that it answer the qualified immunity question. *Id*. at 2. The parties filed no supplement to the record and Defendants expressly concede that "[n]o depositions have been taken in this case and no additional discovery has occurred" since the motion for judgment on the pleadings and its subsequent denial. *Id*.

## 2. FACTS[1]

On or about November 18, 2017, Mitchell entered the Waupun Police Department to inform those present that he was suicidal and that he had tied a noose to kill himself. ECF No. 1 at 3. Officer Grant Nass ("Officer Nass") took Mitchell to Waupun Memorial Hospital ("Memorial Hospital") for an emergency evaluation. *Id*. At Memorial Hospital, staff found that Mitchell was a danger to himself and that he was not free to leave of his own accord. *Id*. The Physician's Final Report described Mitchell's symptoms as "severe." ECF No. 13-3. After leaving Mitchell at Memorial Hospital, Officer Nass verified that Mitchell had tied a noose before he came into the Waupun Police Department. ECF No. 1 at 3. Staff at Memorial Hospital determined that Mitchell was safe to travel, but they did not conclude that Mitchell was no longer a danger to himself.

Mitchell was allowed to leave Memorial Hospital to be transported by the Waupun Police Department via police escort. This police escort was considered to satisfy the Patient Transfer Form requirement that Mitchell be transferred by "qualified personnel." ECF No. 13-3. Mitchell was to be transported to St. Agnes Behavioral Health in Fond du Lac, Wisconsin ("St. Agnes"). ECF No. 1 at 3. At the time that Mitchell was to be transferred to St. Agnes, he was mentally ill and was a proper subject for treatment. What is not entirely clear, however, is whether the officers at issue in this case were aware that Mitchell was being released from Memorial Hospital on the condition that he be transported to St. Agnes by police and whether they were aware that Mitchell was still suicidal.

---

[1] The following recitation of the facts is drawn from the Court's August 25, 2022 order on Defendant's motion for judgment on the pleadings or, in the alternative, motion for summary judgment. ECF No. 21.

Officer Navis was to transport Mitchell to St. Agnes. *Id*. Mitchell asked to be released so that he could walk home and retrieve his vehicle to drive himself to St. Agnes. *Id.* Officer Navis asked Officer Kreitzman for permission to release Mitchell. Officer Kreitzman granted Officer Navis permission to release Mitchell. *Id.* Officer Kreitzman knew that Mitchell came into the Waupun Police Department to inform those present that he was suicidal and that he had tied a noose to kill himself. *Id*. Officer Navis released Mitchell. Mitchell then drove to Barron County and committed suicide. *Id*. at 3–4.

3. **QUALIFIED IMMUNITY STANDARD & ANALYSIS**

"Governmental actors performing discretionary functions are entitled to qualified immunity from suits for damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 713 (7th Cir. 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To overcome a defendant's claim of qualified immunity, "the plaintiff[] must show both (1) that the facts make out a constitutional violation, and (2) that the constitutional right was 'clearly established' at the time of the official's alleged misconduct." *Id.* (citations omitted).

The Court can begin with the second inquiry: whether Mitchell's asserted rights were clearly established at the time of their alleged violation. Plaintiff alleges that Officers Navis and Kreitzman were "deliberately indifferent to Mitchell's serious medical need (suicidality)" when they allowed him to drive himself, ostensibly to St. Agnes, rather than transporting him there themselves. ECF No. 1. As noted, it is Plaintiff's

Page 4 of 17
Case 2:21-cv-00322-JPS   Filed 01/25/23   Page 4 of 17   Document 36

burden to demonstrate that Mitchell's right to be free from such treatment was clearly established at the time that it allegedly occurred.

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). At the same time, however, "[w]hen determining whether a state-created danger claim alleges the violation of a clearly established right, the Seventh Circuit does not demand precise factual symmetry between the precedent(s) relied upon and the facts at hand. *Vaughn v. City of Chicago*, No. 14-C-47, 2014 U.S. Dist. LEXIS 107952, at *11 (N.D. Ill. Aug. 5, 2014).

"It is clearly established that state actors who, without justification, increase a person's risk of harm violate the Constitution." *Paine v. Cason*, 678 F.3d 500, 510 (7th Cir. 2012) (internal citation omitted). This is not a right to protection, but rather is a right not to be placed at harm by state officials. *Monfils v. Taylor*, 165 F.3d 511, 518 (7th Cir. 1998). In some cases, this right extends to noncustodial settings—a government official may, if the circumstances are right, "be held responsible for creating a danger in a noncustodial setting." *Id*. (citing *Archie v. City of Racine*, 847 F.2d 1211 (7th Cir. 1988)).

To state a claim of deliberate indifference to a serious medical need, a plaintiff must show: (1) an objectively serious medical condition; (2) that the defendants knew of the condition or were deliberately indifferent in treating it; and (3) that this indifference caused the plaintiff some injury. *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). For deliberate indifference, "[t]he official must have subjective knowledge of the risk to the [individual's] health, and the official also must disregard that risk." *Id*.

Even if an official is aware of the risk to the inmate's health, "he is free from liability if he 'responded reasonably to the risk, even if the harm ultimately was not averted.'" *Id*. (internal citation omitted). Negligence cannot support a claim of deliberate indifference. *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976); *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011).

### 3.1 PLAINTIFF'S CITED CASES IN OPPOSITION TO A FINDING OF QUALIFIED IMMUNITY

In support of its argument that qualified immunity should not be afforded to Defendants, Plaintiff proffers several cases it considers analogous. ECF No. 15 at 5–7. It first discusses *Paine v. Cason*, 678 F.3d 500 (7th Cir. 2012). There, police arrested an individual at Midway Airport, then released her from their custody over seven miles away in a dangerous and unfamiliar-to-her neighborhood just before nightfall. *Paine*, 678 F.3d at 503–04. The individual had been acting erratically, both before and while in custody, as a result of then-untreated bipolar disorder, but the police ignored those who thought she needed mental health care and instead concluded that she was either merely being difficult or was on drugs. *Id*. at 504. In any event, police left her in a vulnerable state in a high-crime area. Five hours after being left alone in this confused state in a dangerous neighborhood, she was raped at knifepoint and subsequently suffered severe brain damage after having either been pushed or thrown out of a seventh-story window. *Id*. at 506. Importantly, it was undisputed in *Paine* that the individual was in police custody prior to her release later in the evening, and the Seventh Circuit was forced to assume based on the record that the police were aware of her mental instability at the time they did so. *Id*. at 510.

The court in *Paine*, addressing the case only in the context of a qualified-immunity appeal, wrote that the police "not only created the extra risk by moving [her] but were also aware of the crime problem in and near the [area]—and, we must assume, aware that [she] was mentally unstable and unable to protect herself—did nothing to mitigate that risk." *Id*. The Seventh Circuit analogized the officers' conduct to having "released her into the lions' den" at the zoo. *Id*. The court confirmed that several of its prior decisions held that "people propelled into danger by public employees have a good claim under the Constitution." *Id.*

Plaintiff further cites *Armijo v. Wagon Mound Public Schools*, 159 F.3d 1253 (10th Cir. 1998). ECF No. 15 at 6. There, school officials sent a 16-year-old special education student with violent tendencies and known psychological problems home early despite knowing that his parents would not be home. *Armijo*, 159 F.3d at 1256–57. The student had previously told a school aide that he might just be better off dead and stated that he was just going to shoot himself. *Id.* at 1256. The school aide, as well as the school counselor, knew that the student had access to firearms and could make good on this warning. *Id*. Nevertheless, and in violation of the school disciplinary policy, the school sent the student home following an incident and failed to notify the student's parents about his removal from school. *Id.* at 1257. The school counselor dropped the student off at his otherwise unoccupied home, and the student was later found deceased by suicide in his bedroom. *Id*.

In *Armijo*, like in *Paine*, the court addressed only the issue of qualified immunity. *Id.* at 1262 ("[W]e must determine whether the district court was correct in determining that danger creation jurisprudence was clearly established as a matter of law at the time of the conduct here at issue."). The

court concurred with the lower court's conclusion that "the law was clearly established" on that issue. *Id*. The court noted that part of a plaintiff's burden in a state-created danger case was to show that "the charged state entity and the charged individual defendant actors created the danger or increased the plaintiff's vulnerability to the danger in some way." *Id*. at 1263. The court there concluded that the record was sufficient to raise factual inferences that the school employees put the student at "substantial risk of serious, immediate and proximate harm by suspending him from school, which caused him to become distraught and to threaten violence, and then taking him to his home and leaving him alone with access to firearms," that they had "some knowledge" that could support an inference that the student was suicidal, unable to care for himself, and home alone, and that by taking this action, "knowing of [the student's] vulnerability and risks of being left alone at home," the school employees acted recklessly in conscious disregard of the risk of suicide. *Id*. at 1264. The court accordingly concluded that the school employees were "not entitled to qualified immunity on Plaintiffs' danger creation theory claims." *Id*. at 1265.

### 3.2   DEFENDANTS' CITED CASES IN SUPPORT OF A FINDING OF QUALIFIED IMMUNITY

Defendants additionally proffer several cases in support of their claim of qualified immunity. First, they cite *Perez v. Town of Cicero*, No. 06-C-4981, 2011 U.S. Dist. LEXIS 113412 (N.D. Ill. Sept. 30, 2011). There, police responded to a call regarding a domestic disturbance at the home of the individual at issue. *Id*. at *2. By the time they arrived, the situation had calmed and there were no signs of violence. Although the individual was acting odd and as if he were not "in control of himself," and although police had on a previous occasion responded to a call from the residence at which

Page 8 of 17
Case 2:21-cv-00322-JPS   Filed 01/25/23   Page 8 of 17   Document 36

time the individual told an officer he wanted to shoot himself, he on this occasion made no mention of suicide and did not appear to be suicidal. *Id*.

Family members of the individual told the officers that the individual "needed help" and asked them to call an ambulance, but the officers did not do so. *Id*. They did, however, take the individual into custody on suspicion of being wanted for a crime unrelated to the domestic disturbance. *Id*. This suspicion was mistaken, however, and the individual was released only moments later. *Id*. The officers had no communication or interaction with him thereafter. *Id*. Later that day, following his release from custody, the individual died in an incident that was later determined to be a suicide. *Id*. The court granted summary judgment for the officers, writing that no reasonable jury could find that the offers were deliberately indifferent as required for a state-created danger claim because the "*undisputed* facts show that Officer Perez was not subjectively aware of the risk that [the individual] would commit suicide upon his release from custody." *Id*. at *13–14 (emphasis added).

Defendants also rely on *Martin v. Shawano-Gresham School District*, 295 F.3d 701 (7th Cir. 2002). There, a thirteen-year-old student was suspended from school for possessing cigarettes. *Martin*, 295 F.3d at 704. The student reacted poorly to having been discovered, crying persistently despite being reassured by the assistant principal that she was generally a "good kid[] in school" and that she was not in "a lot of trouble." *Id*. The assistant principal learned that the student's parents were both working, and was therefore not able to communicate the suspension to them during the school day. *Id*.

When the bell rang, signaling the end of the school day, the assistant principal asked the student if she needed to take the bus home, and the

student responded that she did. *Id*. at 705. The assistant principal asked her if she was "sure that she did not want him to contact her mother." *Id*. Still crying, the student repeated that she would take the bus, and she left. *Id*. Following her departure, the assistant principal left a voicemail on her parents' home machine notifying them of the suspension. *Id*. They would not receive the voicemail until after they arrived home from work, however, and shortly after arriving home from school, the student committed suicide. *Id*. The court concluded that the "defendants did not create or increase the risk that [the student] would commit suicide, and therefore they did not have an affirmative obligation to protect [her] after school hours." *Id.* at 710.

Defendants additionally cite *Collignon v. Milwaukee County*, 163 F.3d 982 (7th Cir. 1998). There, the individual at issue suffered from schizophrenia and had spent time on both an in-patient and an involuntary commitment basis at the Milwaukee County Mental Health Center ("MCMHC"), during which time he attempted suicide. *Collignon*, 163 F.3d at 985. While he improved on medication, he preferred not to take it because of its side effects. His failure to adhere to his medication regimen deteriorated his mental condition. This eventually led to an arrest by Milwaukee Police Department, and while in their custody, police placed him on the jail's highest level of suicide watch. *Id*. During his time in jail, he met with the jail's psychiatrist, who, knowing of his reluctance to take medications, prescribed him a non-therapeutic dose of medication which would have no effect on his schizophrenia. *Id*. She did so "hoping to cultivate a willingness on his part to eventually take a therapeutic dosage." *Id*. The individual was eventually released on bail and on the condition that his mental condition be monitored by Wisconsin Correction Services. *Id*.

Page 10 of 17
Case 2:21-cv-00322-JPS   Filed 01/25/23   Page 10 of 17   Document 36

Following his release, the individual returned to stay at his father and stepmother's home, but he ran away very shortly thereafter, and his father and stepmother sought the assistance of the Shorewood Police. *Id*. They made the Shorewood Police aware of his mental health history, and the Shorewood Police were able to locate the individual later that evening. *Id*. The police brought him to the Shorewood Police Department, interviewed him, and released him a few hours later, at which time he returned home with his father and stepmother. *Id*. The next morning, however, the individual again quickly left the house. He went to the eighteenth floor of a Milwaukee hotel and committed suicide. *Id*.

The Seventh Circuit concluded that the jail psychiatrist knew that the individual was seriously mentally ill and posed a risk for suicide, which "was enough to trigger a constitutional obligation to provide some level of care and treatment while he was a pre-trial detainee." *Id* at 989. Neither the jail psychiatrist nor any of the other Defendants, however, knew that the individual "was on the verge of committing suicide." *Id*. at 990. The court noted that an expert testified that "no one could have predicted" that he was about to attempt suicide. *Id.*

"Of course a medical professional need not be certain that an individual is about to commit suicide before a constitutional obligation to act is triggered," the court clarified, "but the obligation to take some action is not triggered absent a 'substantial risk' of suicide." *Id*. (internal citation omitted). What was critical was that the plaintiffs there had not demonstrated "a subjective awareness of a substantial risk of imminent suicide" on the part of the defendants. *Id.*

### 3.3 ANALYSIS

Like those courts that have addressed the issue before, this Court concludes that the state-created danger law cited by Plaintiff is clearly established. The contours of that right are "sufficiently clear." *Ashcroft*, 563 U.S. at 741. In attempting to convince the Court as to "whether a state-created danger claim alleges the violation of a clearly established right," Plaintiff was not obligated to demonstrate "precise factual symmetry between the precedent(s) relied upon and the facts at hand." *Vaughn,* 2014 U.S. Dist. LEXIS 107952, at *11. But that is not the end of the story.

Plaintiff insists that there is a "key difference" between the present circumstances and the cases cited by Defendants. ECF No. 15 at 7. That key difference, it argues, is that in those cases, the police did not subjectively know that the individual with whom they interacted was suicidal. *Id*. at 7. Those cases are inapposite, Plaintiff argues, because here, "both Navis and Kreitzman knew Mitchell was suicidal." *Id*.

The Court agrees that in each of the cases cited by Defendants, while the state employees at issue may have had some indication that the individual in their charge was in distress or in a vulnerable state, the state employees did not have actual, subjective knowledge that those individuals were suicidal or at imminent risk of committing suicide at the time of the events giving rise to suit. Plaintiff insists that the present circumstances are different and that qualified immunity is therefore inappropriate.

The complaint asserts that "Navis was made aware of Mitchell's condition, that he was a danger to himself and that he was not to be released" and that "[o]n information and belief, Kreitzman also knew that Mitchell was a danger to himself and that he was not to be released." ECF No. 1 at 3. The record now before the Court, however, demonstrates that

this issue is genuinely disputed. A "genuine" dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal citation omitted). "Rule 56(c) . . . provides that summary judgment 'shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Id*. Such is not the case here.

In response to Request for Admission No. 3 ("At the time you transported Ryan Mitchell from Memorial Hospital, you knew Mitchell was a danger to himself."), Defendants wrote "DENY . . . Mitchell's condition was stable at the time he was discharged from Memorial Hospital and [] no observable deterioration of Ryan Mitchell's condition occurred . . . ." ECF No. 13-2 at 3. This assertion is supported by a discrete portion of the Patient Transfer Form which states that "[t]he patient condition has been stabilized such that, within reasonable medical probability, no material deterioration of the patient's condition . . . is likely to result from transfer." ECF No. 13-3 at 2.

Somewhat confusingly, however, the remainder of the Patient Transfer Form indicates otherwise. It not only acknowledges the reason for transfer as "Depression/Suicide" but also states that a potential risk for transfer was "possible worsening psychiatric symptoms." *Id*. at 2–3. The Patient Transfer Form also indicates that Mitchell's condition was apparently severe enough that he was being released from Memorial Hospital only on the express condition that he be transferred to St. Agnes "by qualified personnel"—specifically, the "Waupun Police Dept." *Id*. at 2.

Indeed, Mitchell signed the Patient Transfer Form indicating his consent to "be transferred by qualified personnel," listed there as "police escort." *Id.* at 3.

The Physician's Final Report applicable to Mitchell, prepared by the Emergency Department Physician who evaluated him, additionally indicates that Mitchell was at imminent risk of suicide. It provides that Mitchell presented with "suicidal ideation," the onset of which was "just prior to arrival." *Id.* at 4. It provides further that the "degree of symptoms is severe" and explicitly lists risk factors as consisting of "suicide risk." *Id.*

A critical issue for purposes of this analysis is that the record does not indicate whether Defendants were privy to this information which provides insight into Mitchell's mental state. It is not clear whether Officers Navis or Kreitzman had access to these documents or notice of the contents thereof prior to their interaction with Mitchell. The record does not indicate whether Officers Navis or Kreitzman spoke to any of the hospital employees who dealt with Mitchell prior to his transfer. So little discovery has been done in this case that the Court has nothing more to draw from beyond responses to three requests for admission and three pages of medical documents. To the Court's knowledge, none of the individuals who interacted with Mitchell at the hospital have been deposed. Despite Plaintiff's requests to do so, neither of the Defendant Officers have been deposed. ECF No. 16-1 at 12 (email from Plaintiff on April 29, 2022, requesting to take depositions of Officers Navis, Kreitzman, and Nass); *id.* at 6 (email from Plaintiff on May 16, 2022, emphasizing need to depose Officers Navis, Kreitzman, and Nass to determine "what was said, what they did and what their state of mind was"); *id.* at 11 (email response from Defendant declining request for depositions); *id.* at 4 (email from Plaintiff

Page 14 of 17
Case 2:21-cv-00322-JPS    Filed 01/25/23    Page 14 of 17    Document 36

on May 16, 2022, emphasizing need for deposition because Plaintiff did not know "what hospital staff told Navis," "what, if anything, they told Kreitzman," "how either Navis or Kreitzman interpreted what they were told," what hospital staff "told Mitchell," or what the Defendant Officers "said to hospital staff at the turnover."); *id.* at 1 (email from Plaintiff on May 19, 2022, emphasizing that Defendants Officers' "knowledge and respective state of mind are crucial to this issue").

As a result, Defendants have insisted on a pre-trial qualified immunity determination but have refused to provide an appropriate record upon which to make such determination. The parties failed to comply with the Court's summary judgment protocols requiring submission of a stipulated set of agreed upon facts. Consequently, the Court does not have a sufficient record before it upon which to determine whether this case is more analogous to those proffered by Plaintiff, or those proffered by Defendants. *See, e.g., Levi v. Adams*, No. 07-3304, 2008 U.S. Dist. LEXIS 128461, at *7–8 (C.D. Ill. Sept. 22, 2008) ("More facts are necessary to make the qualified immunity determination . . . . Accordingly, the Court will recommend that a conclusive decision on qualified immunity await a further developed factual record."); *Sain v. Wood*, 512 F.3d 886, 892 (7th Cir. 2008) (noting that determination of the qualified immunity issue was difficult in part due to the "lack of relevant factual development in the record"); *McKinley v. Kondrasky*, No. 2:14-cv-00155, 2016 U.S. Dist. LEXIS 64097, at *13–14 (W.D. Penn. May 16, 2016) ("In sum, upon review of the present record, the Court finds the evidence concerning the officers' [conduct] to be conflicted but also underdeveloped. Because there are potential disputes concerning material issues of historical fact, the Court cannot presently render any ruling on qualified immunity grounds.");

*Guffey v. Wyatt*, 18 F.3d 869, 873 (10th Cir. 1994) (court properly denied summary judgment on qualified immunity claim where defendant's claim of qualified immunity was inextricably bound to disputed factual issues); *Ortiz v. City of Chicago*, No. 09-cv-2636, 2010 U.S. Dist. LEXIS 10100, at *43 (N.D. Ill. Sept. 22, 2010) (noting that a finding of qualified immunity was not available at time of summary judgment consideration in part due to a "murky factual picture").

Based on the scant record now before the Court, a reasonable juror could go either way (albeit, rather blindly) as to whether Officers Kreitzman and Navis had subjective knowledge that Mitchell was at imminent risk of suicide at the time they allowed him to leave their presence, ostensibly to drive himself to St. Agnes. On the one hand, they were responding to the emergency room for the sole purpose of transferring a psychiatric patient to a facility more equipped to deal with his mental condition, and that psychiatric patient's transfer papers expressly indicated "possible worsening psychiatric symptoms" and a need for "police escort." ECF No. 13-3 at 3. On the other hand, a different portion of the transfer papers indicates that the psychiatric patient's condition was "stabilized" such that no material deterioration of his condition was likely to occur. *Id.* at 2. Importantly, the Court does not read—and does not think that a reasonable juror would read—that portion of the transfer paperwork as suggesting that Mitchell was no longer at risk of suicide. Rather, the Court interprets that language as suggesting that Mitchell had been stabilized to a degree that a transfer from one facility to another would not, in and of itself, place him in an even worse position mentally.

### 4. CONCLUSION

In this instance, the absence of meaningful and detailed discovery plus the presence of material disputed facts makes the task before the Court a difficult one. The Court concludes that it presently has insufficient information before it to make an informed determination as to whether qualified immunity is appropriate in this case. It accordingly will not so determine at this time. *See McNeal v. Bruno,* 2012 U.S. Dist. LEXIS 56769, at *49 (N.D. Ill. Apr. 24, 2012) (acknowledging that there exist cases involving factually intensive questions such that a qualified immunity determination cannot be made before trial); *Chelios v. Heavener*, 520 F.3d 678, 692 (7th Cir. 2008) (concluding that, due to remaining factual disputes, a trial would be required before a determination could be made as to whether defendant was entitled to qualified immunity).

Accordingly,

**IT IS ORDERED** that Defendants' motion to vacate trial date and stay all proceedings, ECF No. 34, be and the same is hereby **DENIED**.

Dated at Milwaukee, Wisconsin, this 25th day of January, 2023.

BY THE COURT:

_____
J. P. Stadtmueller
U.S. District Judge